UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,

**ORDER**
19-CR-0290 (SJF)(ARL)

- against-

BRETT OFSINK,

**FILED**
**CLERK**

2:31 pm, Feb 08, 2021

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

Defendant.
----------------------------------------------------------------X

FEUERSTEIN, District Judge:

On April 17, 2020, the defendant, Brett Ofsink ("Defendant" or "Ofsink"), moved to suppress evidence obtained from a computer seized by law enforcement. *See* Docket Entry ("DE") [18].  The motion was referred to Magistrate Judge Arlene R. Lindsay, who presided over an evidentiary hearing on November 9, 2020, and, after the submission of post-hearing memoranda, issued her findings on the record at a proceeding held on December 22, 2020.[1] Transcript ("Report"), DE [45].  Currently before the Court are Defendant's objections to Magistrate Judge Lindsay's recommendation that Defendant's motion to suppress be denied. *See* Defendant's Objections to Report ("Def. Obj."), DE [48].  The Government has submitted a response to Defendant's objections.  Government's Response ("Govt. Resp.") DE [50].  For the

---

[1] The motion, which was referred by electronic order dated April 17, 2020, did not expressly request a report and recommendation.  On December 22, 2020, Magistrate Judge Lindsay issued an oral ruling purporting to deny the motion, however, the scope of a magistrate judge's authority on a motion to suppress evidence in a criminal matter is limited to the holding of evidentiary hearings and submission of "proposed findings of fact and recommendations for the disposition" of that motion.  28 U.S.C. §636 (b)(1)(B). Accordingly, this Court considers the rulings and findings of fact made by Magistrate Judge Lindsay on the record as her report and recommendations regarding disposition of the motion.

reasons set forth below, the objections are overruled, the Report is adopted, and the motion to suppress is denied.

## I.  FINDINGS OF FACT AND RECOMMENDATIONS

### A.  Facts

Three witnesses testified at the hearing in November 2020: Detective Daniel Fandrey ("Detective Fandrey"), Special Agent Cindy Wolff ("Agent Wolff") (Detective Fandrey and Agent Wolff together, the "Agents"), and Defendant Ofsink.    The facts are taken from the parties' post-hearing submissions, *see* Defendant's Memorandum of Law in Support ("Def. Post-Hearing MOL"), DE [41], Government's Memorandum of Law in Opposition, DE [42], and are not disputed unless otherwise indicated.[2]

### 1.  Initial Investigation

Detective Fandrey is a Suffolk County Detective and a member of an FBI task force that investigates homicides and crimes against children; Agent Wolff is Detective Fandrey's partner on the task force.   In April 2019, the task force received a lead regarding an individual with the screen name "JoshJamie516" who was using a messaging application called "Kik" and was posting and exchanging messages in a chat room with an undercover agent.   (Tr. at 6-7).   On or about April 26, 2019, the JoshJamie516 user, while communicating with the undercover agent, indicated that he was engaging in sexual contact with his daughter, (*Id.* at 7, 169), and sent the

---

[2]  Citations to "Tr." refer to the transcript of the hearing on November 9, 2020. Citations to "GX" refer to government exhibits admitted into evidence during the hearing.

undercover agent non-pornographic photographs of girls between the ages of 8 to 13. (*Id.* at 7). The messages represented that the photographs were of his daughter and her friends.

Subpoenas were issued to Kik and Verizon to determine the owner of the JoshJamie516 account and to locate the IP address used at the time of the exchanges with the undercover agent. They learned from Kik that the user had been using an android cell phone.   (Tr. at 24).   The investigation traced the account owner as Defendant Brett Ofsink residing at 15 Mesa Road, Syosset, New York (the "Residence").   (*Id.* at 8-9).   Although there was an IP address traced to that street address, there is no way to identify a specific person using that IP address.   The Agents suspected that the JoshJamie516 user was most likely Defendant, (*Id.* at 133), but thought it could have been his son.   (*Id.* at 124).   Agent Wolff testified that conversations between the undercover agent and the computer user were not enough to secure a search warrant for the Residence.   (*Id.* at 170).   The three photographs sent were not pornographic, and the Agents testified that they did not have probable cause to believe that anyone at the Residence had downloaded or possessed child pornography.   (*Id.* at 78, 134, 142-143, 169-170).

## 2. Knock-and-Talk

On May 31, 2019, at approximately 6:00 a.m., the Agents went to the Residence to conduct a "knock-and-talk" with Defendant.   (Tr. at 11).   They went early in the morning as they planned to speak with Defendant before he left for work in Manhattan.   (*Id.* at 10-11, 14). Detective Fandrey testified that given the subject matter of the crimes he investigates, "people are more open to talk about when others aren't around," because of embarrassment or some other reason.   (*Id.* at 11).

It was light out when the Agents arrived, (Tr. at 12), and the Agents parked their unmarked car a few houses away from the Residence.   Approximately 10 to 15 minutes after their arrival, they observed the garage door open and Defendant walking to a car parked in the driveway.   The Agents moved their car, traveling at 5 to 10 miles per hour, into a position in front of the Residence partially blocking the driveway.   The Agents, dressed in plainclothes, exited their car and approached Defendant in his driveway, identifying themselves by name as agents from the FBI.   (*Id.* at 16, 148).

 Defendant testified that he exited the Residence through the garage door at approximately 6:20 a.m. to take his son to school   He observed the car "aggressively pull up in front of my house, blocking my driveway."   (Tr. at 174).   As he saw two individuals exit the car and walk towards him, he was "quite scared and a little bit, you know, in shock."   (*Id.* at 175).   At Defendant's request, the Agents displayed their credentials to him.   (*Id.*).   After identifying themselves, the Agents told Defendant that they were investigating issues with internet traffic from his home.

As the Agents approached Defendant, his son emerged from the garage.   Defendant told the Agents that he "need[ed] to take my son to school," (Tr. at 177), and asked if they could finish the conversation upon his return.   The Agents told him they would wait, but they did not direct Defendant that he had to return.   (*Id.* at 18, 154-55).   The Agents moved their car; Defendant left with his son and returned alone about 10 minutes later.   Although Defendant testified that "[i]t was my understanding that I was given the direction that I had to return, I had no choice. It was the FBI." (*Id.* at 177), he conceded on cross-examination that he could have

4

driven somewhere else, there was nothing to stop him from leaving at that point, and that he
voluntarily chose to return home. (*Id.* at 212).   Defendant had his phone with him, but did not
call anyone.   (*Id.* at 213).

Upon Defendant's return home, the Agents, who had been waiting in their car parked on
the street, exited their vehicle; they did not move the car to block the driveway.   Defendant
parked in the driveway, and the parties resumed their conversation while standing at the bottom
of the driveway near the sidewalk.   Defendant acknowledged that he voluntarily consented to
the rest of the conversation.   (Tr. at 212).

When the Agents resumed their conversation with Defendant, Detective Fandrey said that
they were "investigating some things that happened online" and that "perhaps someone in the
home had clicked on the wrong link or been in the wrong place and the wrong time," to which
Defendant responded that he "had clicked on some things, got to some questionable rooms on
this application called Kik."   (Tr. at 21). When he was shown the three photographs of underage
girls sent to the undercover agent, (GX 3), Defendant admitted sharing them in a chat room using
the using the Kik application, (Tr. at 205; GX 3), but denied that the photographs were pictures
of his daughter and her friends.   (Tr. at 22-23, 205).

After Defendant said he had photographs of his daughter, he took out his iPhone and
used facial recognition to unlock it.   The testimony differs on how the photographs on the
phone were reviewed.   Defendant testified that he handed the phone to the Agents at their
request and they scrolled through the photographs. Detective Fandrey initially testified that he
didn't touch the phone, (Tr. at 23), but later stated that while he never held the phone, he did

not remember if he scrolled through it with his finger. (*Id.* at 95).   Agent Wolff testified that

Defendant held his phone while Detective Fandrey was looking at it, but was uncertain who did

the "scrolling." (*Id.* at 158).   In any event, it is undisputed that no pictures of child

pornography were seen on Defendant's phone.[3]

### 3.   Consent to Search Computer

After Defendant displayed his iPhone, Detective Fandrey became curious as to why Kik

had indicated he had used an android phone and asked Defendant if he used any other phone or

devices.   (Tr. at 24).   According to Detective Fandrey, Defendant replied that he used an

application called BlueStacks, which enables a computer to emulate a phone, on his home

computer.   (*Id.*).   Defendant further admitted that he used the JoshJames user name on the

home computer.   (*Id.*).   The Agents then asked to see Defendant's computer.   (*Id.* at 24-25,

158-159); *see also id.* at 25 (Detective Fandrey said, "we'd like to take a look at it, we'd like to

examine the computer, and kind of see what's on there and to kind of validate what [the

defendant] had told us").   Defendant replied "yes," and walked into the garage.   (*Id.* at 25, 161).

Detective Fandrey asked if he could come into the house with Defendant, and after Defendant

indicated he would prefer that they stayed outside, the Agents waited in the garage.   (*Id.* at 25-

26).   Defendant returned to the garage and handed the computer to the Agents.   (*Id.* at 26, 179).

Defendant testified that the Agents stated that they "needed to see" his computer. (Tr. at

178, 202), but did not explain that they intended to search the hard drive; nor did they tell him

---

[3]It is also apparently undisputed that Defendant's daughter, as shown in photographs on his phone, was not one of the girls in the three photographs shared in the chat room. *See generally* Tr. at 178.

that he had a right to say no. (*Id.* at 229).   He further testified that "[i]n my view I believe I was being directed to do something by the FBI and had no choice." (*Id.* at 229).   Defendant did not object, and "[n]othing was said from the point where they asked for my computer to the point that I handed them the computer." (*Id.* at 179).

Detective Fandrey read off the computer's serial number to Agent Wolff, who recorded it on a general receipt form ("Receipt"), (GX 4), and a Consent to Search Computer(s) form (the "Consent Form"), (GX 2).   Defendant gave the Agents the password to the computer, which Agent Wolff noted on the consent form. (Tr. at 29-30).

The Consent Form, with underlined information provided by Defendant prior to signing the form and handwritten in by Agent Wolff, states as follows:

> I, <u>Brett Offsink</u>,[4]   have been asked by Special Agents of the Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers, any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals, described below:
>
> <u>S/N 8CG843061B HP Computer</u> and located at <u>15 Mesa Road Syosset NY</u>, which I own, possess, control, and/or have access to, for any evidence of a crime or other violation of the law. The required passwords, logins, and/or specific directions for computer entry are as follows: <u>6463</u>
>
> I have been advised of my right to refuse consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

---

[4] Defendant's name was misspelled with an extra "f" on both the Consent Form and the Receipt.

7

> I authorize those Agents to take any evidence discovered
> during this search, together with the medium in/on which
> it is stored, and any associated data, hardware, software
> and computer peripherals.

(GX2).   Beneath those statements is the date, May 31, 2019, as well as the signatures of

Defendant and Agent Wolff. (GX 2; Tr. at 30-32).

After Defendant had handed the computer to the Agents, Agent Wolff handed him

both the Receipt and the Consent Form.   All three witnesses were uncertain about whether

the documents were given to Defendant simultaneously or one at a time.

Detective Fandrey testified that he told Defendant he was giving him a consent

form that they "needed in order to look at his computer."   (Tr. at 76; *see also id.* at 31 ("I

believe that I said to Mr. Ofsink, that this is a document that we need in order to look at

your computer. I said I believe that each and every time we do these, we kind of had a

method in which we do them. And that's the method which I do every time we fill these

out.")). He could not recall if Agent Wolff said anything about the consent form to

Defendant at the time. (*Id.* at 67).   According to Detective Fandrey, Defendant looked at

the Consent Form for 10 to 20 seconds or less than a minute before signing it, (*Id.* at 31-32,

71), but he could not say whether Defendant had read the form.   (*Id.* at 76).

Defendant testified that as to the documents, "[n]obody read them to me and nobody

explained them to me."   (Tr. at 180).   After he signed, "there was no conversation other than

here's the receipt." (*Id.* at 179).   Defendant denied reading the forms, and testified that the

Agents indicated where on each form he should sign. (*Id.* at 196).   He stated that he "was in

shock," felt threatened, and did not believe he was free to leave, (*Id.* at 197), and that the Agents, while not yelling, were speaking in an "authoritative" tone. (*Id.* at 199).   Defendant acknowledged that he provided the computer's password upon handing the device to the Agents, (*Id.* at 202, 213), but denied knowing that the Agents were going to search the computer.   When asked what he thought the Agents intended to do with it, he testified   "I really don't know.   I was in a state of shock."   (*Id.* at 208).

As to the anticipated return date for the computer, Defendant testified that Detective Fandrey said it would be returned later that day or on Monday. (Tr. at 180).   Detective Fandrey recalled that he told Defendant he could not give a date certain: "[i]t could be either two days, two hours, two weeks, I don't know, it all depends on how the stuff is and how much, how long the computer takes to analyze."   (*Id.* at 32-33).   Agent Wolff gave the defendant her business card, which contained her contact information, and the Agents left. (*Id.* at 34).   By approximately 7:00 a.m., the Agents had already left Defendant's home. (*Id.* at 35).   Including the conversations before and after Defendant's trip to take his son to school, the Agents spoke to Defendant for approximately 15 minutes. (*Id.* at 35-36).

### 4.   Search of the Computer, Defendant's Arrest, and Post-Arrest Statements

Upon returning to his office on Friday, May 31, 2019, Detective Fandrey commenced a forensic analysis of Defendant's computer using a software program.   No child pornography was found on the first hard drive, and on Monday, June 3, 2019, analysis of the computer's second hard drive commenced.   Later that day, Detective Fandrey discovered the BlueStacks software, the Kik application, family photos, child erotica, and between 800 and 1000 images and

videos containing child pornography on the second hard drive. (Tr. at 42-43).   Detective

Fandrey's analysis was completed by June 5, 2019.

Defendant called Agent Wolff on May 31st, June 3rd, and June 4th, leaving messages

"about the status of my computer," but those calls were not returned.   (Tr. at 181).   He left

another message on June 5th, which Agent Wolff did return after the search of the computer

was completed, and arrangements were made for Defendant to pick up the computer on

Friday, June 7, 2019.   Defendant did not revoke his consent to search his computer in any of

his messages to Agent Wolff. (*Id.* at 140, 227-28).

After Detective Fandrey located child pornography on Defendant's computer, he

notified Agent Wolff, and they in turn notified the United States Attorney's Office. (Tr. at

50).   The Agents obtained a warrant for Defendant's arrest on June 6, 2019, and on the

morning of June 7, 2019, Defendant was arrested in the driveway of his Residence.

Upon arrest, Defendant was handcuffed, his *Miranda* rights were read to him, and

he was placed in a vehicle.   (Tr. at 54).   Defendant agreed to speak with Detective

Fandrey, executed a *Miranda* waiver form, (*Id.* at 55, 184; GX8), and told the officer that

he used Kik and the JoshJamie516 account, and that he had received and viewed child

pornography.   (Tr. at 54-55).   During the conversation, Detective Fandrey showed

Defendant images found on his computer.   Defendant claims that the interview began with

display of the images.   A written statement was also prepared and signed by Defendant,

including corrections initialed by Defendant.   (GX 6).   In the written statement, Defendant

states, *inter alia,* that he has received child pornography in chat rooms, has "watched videos

and images to completion," has sent and received images and video of children, and has

been in chat rooms where he has "talked about sexual acts with kids, both other people[']s

kids and my own."   *Id.*   He further states that he has never touched his kids or any other

kids sexually, and that he did not take any pictures or videos of kids.   *Id.*

Defendant also executed a consent to assume online identity form, which related to

several of his online accounts including the JoshJamie516 account.  (Tr. at 56-57; GX 7). In

the written statement and the consent to assume online identity forms, Defendant

acknowledged that he was voluntarily consenting to the use of his online identities and that

he had not been threatened or promised anything. (Tr. at 57-59, GXs 6, 7).

**B.   Report's Findings and Recommendations**

In the Report, Magistrate Judge Lindsay made various factual findings in support of her

recommendation that the motion to suppress be denied, including:

- Regarding the manner in which the Agents pulled their car up to the driveway
  prior to the parties' first conversation, which Defendant had described as
  "aggressive," Magistrate Judge Lindsay "credit[ed] the agent testimony that the
  manner in which they pulled up is not aggressive at all," Report at 10, and that the
  Agent's testimony that the move was slow and non-threatening was more
  believable.   Report at 5.

- As to Defendant's leaving the Residence to take his son to school, Magistrate
  Judge Lindsay found that "there was nothing said to the defendant to suggest that
  he had to return or that he couldn't leave the premises.   There was no yelling, no
  brandishing of weapons, and it's significant that the defendant was not even told
  that he had to come back."   Report at 6.

- Regarding the Agents' request to see the computer, noting that Defendant "raised
  no objection," Report at 7, and finding that the Agents "didn't say anything that
  could be construed as an order to retrieve the computer."   Report at 7.
  Defendant handed over the computer, and when asked, "simply gave them the

11

password." *Id.*

- Pertaining to Defendant's credibility and the voluntariness of his signing the Consent Form:

  o "Defendant now claims that the consent was not voluntary. Not voluntary because he felt he was bewildered he was overwhelmed by authority.   He was in a state of shock, he felt he had no choice, he was not told he had a choice.   He never read the consent form which was signed and he claims (inaudible-connection) searched.   Well there was nothing said or done to support these claims.   The defendant admits he was never actually threatened.   There was no claim that anything of a threatening nature was said, by any of the agents.   He was never told he could not leave the house or that he was required to speak to the agents.   Nothing was said that would cause him to believe he was require[d] to surrender his computer to be searched.   The entire exchange took approximately 15 minutes.   He was on his home turf in his driveway, not even in his home.   He claimed that he didn't know the computer would be searched is frankly incredible.   He handed over his password.   He was told they were going to take days to look at it (inaudible) although his argument was that looking is not the same as searching.   I find that argument unpersuasive." Report at 8-9.

  o  Finding that "[e]ven a cursory glance at that consent form would have revealed what it was, because right at the very top, in bold letters in black was consent to search.   Had he merely glanced at the form he would [have] noted that.   It's incredible that he didn't understand that there would be a search of the contents of the computer."   Report at 12.

  o Defendant's claim that he didn't know what he was signing when he signed the consent form "is incredible in light of the background from the conversation that [preceded] his signature and the clarity of the form."   Report at 12.

- As to Defendant's claim that he was coerced or cowed by the Agents' authority, Magistrate Judge Lindsay found "nothing coercive that he had testified to in the actual verbal exchange."   Report at 11.   Further, he asserted himself on several occasions including telling the Agents he was taking his son to school, asking them to

12

display their identification a second time, and telling them to wait outside while he went into the house to get his computer.   *Id.*   Magistrate Judge Lindsay concluded that this conduct "flies in the face of this notion that he was overcome by authority." *Id.* at 11-12.   Finally, she found "defendant's manner and that of the agents throughout their interaction was cooperative.   There was no indication at any point that the conversation itself had turned aggressive."   *Id.* at 12-13.

Magistrate Judge acknowledged that Defendant was not told that he had the right to refuse to consent, Report at 10, but recognized other factors in her determination including Defendant's education, position as a financial risk manager in a high pressure profession, and familiarity "with the importance of a signature on a document."   *Id.* at 11.

Based on the testimony and evidence, Magistrate Judge Lindsay found that given the totality of the circumstances, it was objectively reasonable for the Agents to conclude that consent was given.   Report at 12; *see also id.* at 13 ("it was reasonable for the agent[s] to conclude that they were given voluntary consent.").   As such, the motion to suppress should be denied, and, in light of that recommendation, the Magistrate Judge Lindsay rejected the fruit of the poisonous tree argument.   *Id.*

## II.   LEGAL STANDARDS

### A. Objections to a Report and Recommendation

Any party may serve and file written objections to a report and recommendation of a magistrate judge within fourteen (14) days after being served with a copy thereof.   28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59(b)(2).   Any objection to the magistrate judge's recommendation is entitled to *de novo* review.   FED. R. CRIM. P. 59(b)(3).   The Court is not, however, required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed.   *See Thomas v. Arn,,* 474 U.S. 140, 150, 106 S. Ct. 466, 88 L. Ed. 2d

435 (1985); *United States v. Ballares,* 317 F. App'x 36, 38 (2d Cir. 2008).   Indeed, failure to

object "waives a party's right to review."   Fᴇᴅ. R. Cʀɪᴍ. P. 59 (a), (b)(2)*; see also United States.*

*v. Male Juvenile,* 121 F.3d 34, 38-39 (2d Cir. 1997) ("failure to object timely to a magistrate

judge's report may operate as a waiver of any further judicial review of the decision, as long as

the parties receive clear notice of the consequences of their failure to object").   Whether or not

proper objections have been filed, the district judge may, after review, accept, reject, or modify

any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cʀɪᴍ.

P. 59 (b); *see generally King v. City of N.Y., Dep't of Corr.*, 419 F. App'x 25, 27 (2d Cir. 2011)

(summary order) (noting that the waiver rule is "nonjurisdictional" and, thus, the Court may

excuse a violation thereof "in the interests of justice." (internal quotation marks and citation

omitted)).

 "The Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary

hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily

accept those credibility findings."   *United States v. Lawson,* 961 F. Supp. 2d 496, 499

(W.D.N.Y. 2013) (*citing Carrion v. Smith,* 549 F.3d 583, 588 (2d Cir.2008)).   The court "may

not reject a proposed finding of a magistrate judge that rests on a credibility finding . . . without

personally hearing live testimony from the witnesses whose testimony is determinative."   *United*

*States v. Morillo*, No. 08 CR 676, 2009 WL 3254431, at *1 (E.D.N.Y. Oct. 9, 2009); *see also*

*Carrion*, 549 F.3d at 590 (2d Cir.2008) (for a district court to "adhere to its own credibility

conclusions, as opposed to those found by the magistrate judge, the district court would need to

conduct a renewed hearing to appraise the credibility of the witnesses").

Defendant objects to the Report, arguing, *inter alia,* that Magistrate Judge Lindsay erred in (1) suggesting that the Agents lacked probable cause to seek a warrant prior to arriving at Defendant's home on May 31, 2019, Def. Obj. at 16-17; (2) failing to apply the appropriate standard, as set forth in *Florida v. Jardines,* 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013), to evaluate the propriety of the knock-and-talk, *id.* at 18-22; (3) finding that the Government met its burden of proving Defendant's voluntary consent to the search of his computer, because (a) the evidence does not support the conclusion that Defendant read and understood the consent form, *id.* at 22-27; and (b) the factual finding that Defendant was not intimidated by the agents' conduct was in error, *id.* at 27-31; and (4) holding that the Defendant's subsequent statements to the Agents were not fruit of the poisonous tree.   *Id.* at 31-32.[5]

## B. Motion to Suppress

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures."   U.S. Const. Amend. IV.   "It is ... well settled that one of the specifically established exceptions" to the Fourth Amendment requirements that private property not be searched without a search warrant issued upon probable cause "is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973).   Generally, a defendant who moves to suppress evidence that he

---

[5]Defendant periodically refers to the Government's "failure" to offer Agent Wolff's testimony about the events to corroborate Detective Fandrey's account.   *See, e.g.,* Def. Obj. at 30.   He does not, however, object to the Magistrate Judge's express decision that no negative inference would be drawn from Agent Wolff's failure to testify about the "whole sequence of events," and noting that she was "available to the defendant and could have testified if that was needed" to "demonstrate some consistency."   Report at 13.

contends derives from an illegal search "bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure," *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir. 1991); however, where the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth,* 412 U.S. at 222 (internal quotation marks and citation omitted).

## III.    REVIEW OF THE REPORT

### A.  Probable Cause for a Search Warrant as of May 31, 2019

Defendant's first objection, entitled "The Magistrate Erred in Holding that the Agents Lacked the Ability to Seek a Warrant," states that Magistrate Judge Lindsay "suggested that the agents had properly set out to perform a 'knock and talk' because, as of May 31, 2019, they lacked probable cause to seek a warrant."   Def. Obj. at 16.   Despite Defendant's characterization, this Court finds nothing in the Report purporting to find, either expressly or implicitly, that the Agents lacked probable cause sufficient to secure a warrant prior to May 31, 2019.[6]

This argument was not raised by Defendant in the original motion papers or in his post-

---

[6]A review of Defendant's argument proves difficult since he incorrectly cites the pages and lines purportedly containing Magistrate Lindsay's "comments."   *See* Def. Obj. at 16, n.3 (citing Report at 14:10-11).   On page 4, Magistrate Judge Lindsay stated that "[a]lthough the name, the defendant's name was on the email account[,] that gave the officers no assurance that he was the person who had actually entered the chat room.   Also [inaudible] information to make any arrest."   Report at 4:10-11.   To the extent this statement may have contained some reference to probable cause, that reference related to probable cause to effect an arrest, not to obtain a search warrant.

hearing submissions, but rather argued for the first time in his objections.   "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not."   *United States v. Gladden,* 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).   Defendant has offered no reason why he failed to make this argument before Magistrate Judge Lindsay and, as such, he has waived it.

Even if the argument was not forfeited, Defendant offers no explanation for the relevance of this objection. The undisputed testimony from the Agents was that in light of the chat room exchanges of texts and photographs, they were investigating possible child abuse of a daughter by her father.   The only three photographs posted in the chat room were not pornographic.   *See* GX 3.   Defendant does not argue that the Agents had any suspicions, let alone evidence supporting probable cause for issuance of a warrant, regarding the possession of child pornography prior to May 31, 2019.   Instead, Defendant argues that probable cause existed given the evidence that Defendant, "or another person in the home," was sexually abusing Defendant's daughter.   Def. Obj. at 17.   The Court declines to engage in an analysis of the hypothetical question of whether a warrant could have issued on this basis, or whether the scope of the fictional warrant would have covered a search of Defendant's electronic devices, including his home computer.

**B.  Knock-and-Talk**

Defendant argues that the Magistrate Judge "failed to first consider whether [the Agents] were within their rights in entering onto [defendant]'s property in the first place."   Def. Obj. at

17

18.   He reasons that since they were not within their rights, any consent Defendant may have

given to the search was tainted by the Agents' "illegal entry."   *Id.*   Defendant raised this

argument, for the first time, not in his original motion papers or in his post-hearing memorandum

of law, but rather in his post-hearing reply papers.   *See* Defendant's Reply Memorandum, DE

[43].

The knock-and-talk investigative tool rests upon the concept that "a police officer not

armed with a warrant may approach a home and knock, precisely because that is no more than

any private citizen might do."   *Jardines,* 569 U.S. at 8 (internal quotation marks and citation

omitted).   "[W]hether the person who knocks on the door and requests the opportunity to speak

is a police officer or a private citizen, the occupant has no obligation to open the door or to

speak. . . And even if an occupant chooses to open the door and speak with the officers, the

occupant need not allow the officers to enter the premises and may refuse to answer any

questions at any time." *Kentucky v. King*, 563 U.S. 452, 469–70, 131 S. Ct. 1849, 179 L. Ed. 2d

865 (2011) (internal quotation marks and citations omitted).   "[I]t is not a Fourth Amendment

search to approach the home in order to speak with the occupant, because all are invited to do

that.   The mere purpose of discovering information . . . in the course of engaging in that

permitted conduct does not cause it to violate Fourth Amendment."   *Jardines,* 569 U.S. at 9, n.4

(internal quotation marks, citation, and emphasis omitted)

Cases challenging the constitutional validity of a knock-and-talk fall into two broad

categories.   "Sometimes, officers appear with overbearing force or otherwise seek to suggest

that a homeowner has no choice but to cooperate.   Other times, officers fail to head directly to

the front door to speak with the homeowner, choosing to wander the property first to search for whatever they can find." *Bovat v. Vermont,* 141 S. Ct. 22, 22 (U.S. Oct. 19, 2020) (Gorsuch, J., statement respecting the denial of certiorari).   The facts here do not fit neatly into one scenario over the other.

The interactions between the Agents and Defendant occurred not at the front door, but rather in the driveway and, to a lesser extent, the garage.   He does not argue, however, that the Agents were using that time to impermissibly search the curtilage.   Instead, he contends that the Agents' conduct exceeded that which might be expected from an "ordinary visitor." Specifically, he claims that a homeowner would not expect (1) a visitor to block his driveway prevent him from leaving, or (2) to be "assailed in [his] own driveway at 6:00 in the morning," Def. Obj. at 20.

The Magistrate Judge specifically found, based on the testimony of the witnesses, that the Agents' movement of their car was not aggressive, but rather slow and non-threatening.   There is no testimony that the driveway was blocked to the extent that Defendant was prevented from leaving or that the Agents had any such intent.   The Report notes that the driveway was two-cars in width and that the Agents' car only partially blocked it.   Report at 5.   Although the testimony is clear that the Agents moved the car before Defendant took his son to school, there is no evidence that he would not have been able to leave had they not taken that action.   It cannot be said that, as a matter of law, an "ordinary visitor" would not park in such a way to temporarily

19

obstruct part of the driveway.[7]

He focuses the bulk of his argument on the time of day, relying upon the Supreme

Court's observation in *Jardines*, noted in dicta in both the majority and dissenting opinions, that

a "middle of the night" visit would be a cause for great alarm to a typical person.   *Jardines,* 569

U.S. at 9, n.3; *id.* at 20 (Alito, J. concurring).   Defendant contends that "ordinary visitors" do not

arrive at 6:00 a.m.   In support, he states that the facts of his case "closely resemble" those

present in a state case in Michigan.   *See* Def. Obj. at 21 (citing *People v. Frederick,* 500 Mich.

228, 895 N.W.2d 541 (2017).   In *Frederick,* the searches at two homes were conducted at 4:00

a.m. and 5:30 a.m., and there was testimony that at both locations, everyone appeared to be

asleep.   A defendant at each home answered the door after a few minutes, thinking there was an

emergency, and was confronted by seven police officers.   Here, the Agents arrived at 6:00 a.m.

when it was already light outside.   Detective Fandrey testified that they arrived at the Residence

in the hopes of speaking with Defendant before he left for work.   They did not knock on the

door or disturb other occupants at the Residence who may, or may not, have been sleeping.

They stayed in their vehicle and only moved it and emerged to speak with Defendant after he had

opened his garage door and exited his house.   There was no testimony to suggest that Defendant

was drowsy, or that he had just awakened; to the contrary, he was awake and alert enough to

drive his son to school.   Any "surprise" or "alarm"caused by the timing of the Agents' arrival

---

[7] In addition, the testimony was that the Agents' car, while partially blocking the driveway, was parked in front of, and not in Defendant's driveway.   Neither party has addressed the extent to which, if any, the portion of the street in front of a homeowner's driveway constitutes curtilage to which that homeowner may claim constitutional protection.

would have dissipated by the time he returned from the drive to school and voluntarily continued

the conversation.   Additionally, he could have retreated into his home at any time and

terminated the conversation.

Upon *de novo* review, and finding no constitutional infirmity in the knock-and-talk

procedure employed here, Defendant's objection on this basis is overruled, and the Report is

adopted.

## C.  Voluntariness of Consent

Defendant's main objection is that the Government did not carry its burden of

establishing that he consented to the search of his computer.   He phrases his objection in two

subparts:   (a) did Defendant consent to a forensic examination of his computer, and (b) was that

consent "free and voluntary."   Def. Obj. at 22.

Magistrate Judge Lindsay, having taken the testimony from the witnesses, was in the best

position to assess the credibility of those witnesses.   *See generally Diesel Props S.r.l. v.*

*Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) ("The court is also entitled, just as

a jury would be, to believe some parts and disbelieve other parts of the testimony of any given

witness.") (citations omitted)); *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) ("[A]

witness's demeanor on the stand, including his or her confidence, impacts the assessment of

credibility").   Accordingly, this Court defers to and accepts the Magistrate Judge's

determinations regarding the credibility, or incredibility, of witnesses.   *See* Section I, B, *supra*.

Amongst those determinations is Magistrate Judge Lindsay finding that Defendant's claim that

he did not know that the computer was going to be searched "is frankly incredible."   Report at 9;

*see also id.* at 12 (in light of the bold black letters on the Consent Form, "[i]t's incredible that he didn't understand that there would be a search of the contents of the computer").

As to the voluntariness of the consent, the question is "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied." *Schneckloth,* 412 U.S. at 227.   Voluntariness "is a question of fact to be determined from the totality of all the circumstances," *id.,* "both the characteristics of the accused and the details of the interrogation." *Id.* at 226.   "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."   *United States v. O'Brien,* 926 F.3d 57, 77 (2d Cir. 2019) (*quoting United States v. Garcia,* 56 F.3d 418, 423 (2d Cir. 1995)).   The standard for evaluating a suspect's consent is "objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991).

The Magistrate Judge determined, based on the totality of the circumstances, that the Agents had a reasonable basis to believe that Defendant had consented to the search of the computer.   Numerous factors were taken into account including Defendant's education, profession, the duration of the interactions, and whether there was a show or use of force. Magistrate Judge Lindsay found no coercion in the verbal exchanges, no threats, no brandishing of weapons, no yelling.   Instead, the interaction was cooperative throughout, Defendant freely handed them the computer, gave them the password, and signed the Consent Form.   The Report acknowledges that Defendant was not expressly informed by the Agents verbally that he had the right to refuse consent to the search.   This fact is not dispositive, however, but rather only one

22

factor to be considered.   *See Schneckloth,* 412 U.S. at 227   ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent").

In his objections, Defendant argues that there is no evidence that he "read" the Consent Form prior to signing it.   As proof that he did not read either the Consent Form or the Receipt, Defendant points to the fact that his last name was misspelled with an extra "f" on both forms, an error he argues he would have corrected if he had, in fact, read the documents.   There is no suggestion, either in the record or in the Report, that Defendant reviewed the Consent Form thoroughly and parsed all its language; indeed, he looked at it for under a minute.   As the Report notes, however, the form is titled, in bold, all caps, large typeface "**CONSENT TO SEARCH COMPUTER(S)**" and "[e]ven a cursory glance at that consent form would have revealed what it was."   Report at 12; *see also United States v. Gazzara,* 587 F. Supp. 311, 328 (S.D.N.Y. 1984) (finding unbelievable defendant's contention that she failed to read or understand the importance of a consent form headed "CONSENT TO SEARCH").   Further, the Magistrate Judge properly considered the totality of all the circumstances and found that Defendant's "claim that he didn't know what he was signing is incredible in light of the background from the conversation that proceeded his signature and the clarity of the form."   Report at 12.   The surrounding circumstances may be sufficient to establish voluntary consent even where a defendant claims to have not read the consent to search form.   *See United States v. Schaefer,* 859 F. Supp. 2d 397, 406-07, 411 (E.D.N.Y. 2012) (finding defendant's testimony that he did not read the written consent form to be incredible and that "[i]n any event, the agents would have had no reason to

23

believe that, based upon the surrounding circumstances, that his consent was not voluntary"),
*aff'd* 519 F. App'x 71 (2d Cir. 2013).   Thus, the evidence supports a finding that Defendant
knew in substance what he was signing and that it was a precursor to the search of the computer.

Defendant's contention that he was in a state of shock and was intimidated by the
authority of the FBI is not supported by the evidence, nor does he claim that he communicated
that state of mind to the Agents.   The Magistrate Judge found that several acts taken by
Defendant, such as leaving to take his son to school and telling the Agents to wait in the garage,
belie the argument that he was overcome by authority.   Finally, as the Report notes, Defendant
never revoked his consent after the Agents left and he had time alone to consider the events of
the day free from their presence.   Report at 13.

The Report's finding that the Agents had a reasonable basis to believe that Defendant had
voluntarily consented to the search is supported by the evidence.   Upon a *de novo* review,
Defendant's objection regarding the voluntariness of his consent is overruled.

**D.   Post-Arrest Statements**

The Report concluded that any analysis of Defendant's post-arrest statements as fruit of
the poisonous tree was rendered unnecessary by the determination that the motion to suppress
should be denied.   As Defendant's objection regarding whether his consent was voluntary has
been overruled, his objection based on a fruit of the poisonous tree argument is likewise
overruled.

**E. Remainder of the Report**

The Court has reviewed the remainder of the Report to which no objections have been

24

made for clear error in either the reasoning or the conclusions reached therein, and finding none, accepts the remainder of the Report.

## V.  CONCLUSION

The Report is adopted in its entirety.   Defendant's motion to suppress, DE [18] is denied.[8]

**SO ORDERED**.

                                    /s/ Sandra J. Feuerstein
                                    Sandra J. Feuerstein
                                    United States District Judge

Dated: Central Islip, New York
       February 8, 2021

_____

[8]Defendant's letter transmitting transcripts of the proceedings, *see* DE [46], was mistakenly docketed as a motion and as such, the Clerk of the Court is directed to terminate it.   Defendant's objections, DE [48], were also filed as a motion; the Clerk of the Court is directed to terminate it as well and modify the entry to indicate that the entry is Defendant's Objections to the Magistrate Judge ruling, which was docketed as DE [44].