## SCARING & CARMAN PLLC
ATTORNEYS AT LAW
SUITE 501
666 OLD COUNTRY ROAD
GARDEN CITY, N.Y. 11530-2004

(516) 683-8500

FAX
(516) 683-8410

STEPHEN P. SCARING, P.C.
SUSAN SCARING CARMAN

MATTHEW W. BRISSENDEN
OF COUNSEL

sscaring@scaringlaw.com
scarman@scaringlaw.com

October 12, 2021

**Via ECF**

The Honorable Denis R. Hurley
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Re: *United States v. Brett Ofsink*, Docket No. 19 CR 209

Dear Judge Hurley,

    This firm represents the Defendant Brett Ofsink in the above-referenced matter. On March 19, 2021, Mr. Ofsink pled guilty to Count One of the Indictment, charging him with receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2). In the plea agreement entered into by the Defendant and the Government, the parties stipulated to a total offense level of 32, which carries with it a recommended sentencing range of 121-151 months.

    On July 19, 2021, the United States Probation Department prepared its Presentence Investigation Report, wherein Probation calculates a total offense level of 34, with an advisory sentencing range of 151-181 months. Probation is recommending a below-Guideline's sentence of 60 months, which represents the mandatory minimum sentence for an offense under 18 U.S.C. § 2252(a)(2).

    As set forth below, we would respectfully ask the Court to adopt the lower offense level set forth in the parties' plea agreement. Furthermore, for the reasons set forth below, we are asking the Court to impose the mandatory minimum sentence of 60 months' incarceration.

## I. DEFENDANT'S BACKRGOUND

    Brett Ofsink was born in Brooklyn, New York in July of 1976. He was raised – along with his two older brothers – in a middle-class setting in Bellmore, New York. His father, Jay, was a partner at an accounting firm, while his mother, Abby, worked on and

off as a nurse. Mr. Ofsink shared an extremely close bond with both of his parents; he describes his childhood as happy and well-adjusted.

Mr. Ofsink attended public schools, where he did well academically and was highly involved in sports and extracurricular activities. Upon graduating from high school in 1994, he enrolled at the University of Florida, where he majored in finance, with a concentration in accounting.

After college, Mr. Ofsink moved to New York City, where he took a position with the Bank of New York. Over the next several years, Mr. Ofsink worked long hours as a banking associate, while steadily moving up through a series of positions. From the Bank of New York, he moved to HypoVereinsbank, and then on to Citibank, where he took a job as an Assistant Vice President.

Around this same time, Brett reconnected with Beth Paskus, a long-time childhood friend, whom he had known since elementary school. The two began dating, and by 2002, they were married. The young couple bought a home in Syosset, and in 2004, welcomed their first child, Jordan Ofsink. Their daughter Lindsay was born several years later, in 2007.

Shortly thereafter, however, Brett and Beth faced a series of stressors that placed an intense strain on their marriage and led to a growing sense of distance between the couple.

To begin with, in 2008, the financial crisis struck, rocking Brett's entire industry and putting the department where he worked into crisis mode. Brett was put in charge of over 190 projects involving severe liquidity risk management issues. For the next several years, his hours – which had always been long – increased, until he was working 17 or 18 hour days. During this time, it was not unusual for Brett to get home at 2 a.m.

In the meantime, with Brett largely absent, Beth began to have growing concerns about the health and wellbeing of Jordan, after he began showing developmental delays, struggling with issues of speech and physical coordination. By age five, Jordan was still unable to navigate stairs.

Beth and Brett sought out a series of medical specialists in the city, who provided the young couple with a variety of dire diagnoses, widely ranging from autism to oppositional defiant disorder. Brett, in the meantime, tried unsuccessfully to assure his wife that their son was merely going through an awkward phase, which he would eventually grow out of.[1] The disagreement about what should be done for their son led to a series of bitter arguments, and the relationship between Beth and Brett became increasingly strained.

---

[1] Thankfully, Jordan *did* eventually grow out of these issues. By the time Mr. Ofsink was arrested in 2019, Jordan had developed into a healthy and normal 14-year-old boy.

The end result was that by 2009, the Ofsinks were no longer living as a married couple; all physical intimacy had ceased, and they were living in a state of unspoken, mutual resentment. When Brett's father passed in 2010, he felt devastated and completely alone. For years, Jay Ofsink had been his son's mentor and best friend; they spoke daily, and Brett had come to depend on his father's advice on all matters, ranging from work to family.

The next nine years passed in much the same manner. Although they did not discuss their problems or lack of intimacy, Brett's relationship with his wife remained distant. And when the financial crisis passed, a new job with Ernst and Young led to increased pay and increased responsibilities. As part of his new position, Brett began to travel frequently, which meant more time away from his family. In the face of these responsibilities, Brett strove mightily to make time for his children. As his mother notes in her letter to the Court:

> I could hear in our phone conversations and when we met in person that Brett was under a lot of stress from work and family demands. I also felt like he was suffering personally and believed that it was the result of never taking the time to address and process the loss of his father . . . This was on top of what seemed like insurmountable client demands and revenue targets from his employer. I recommended that he seek therapy, but he felt that he didn't have the time in his busy life, instead prioritizing meeting the demands of his immediate family. Brett still managed to dedicate time for his children on the weekends with mandatory father/son lunches and helping his daughter build out a business to sell bracelets. Brett would go directly from the train on weekdays at 9 pm at night to watch his daughter finish up at gymnastics or catch the last quarter of a basketball game for his son. He did whatever he could to try and balance his time with work and family, but it was very challenging.

*See* letter from Abby Ofsink, attached hereto as Exhibit A.

While Brett was happy to support his family, and proud of his success at work, at some level, he also felt trapped. Brett increasingly felt that he would gladly trade some of his earning power for a better quality of life and more time with the family that he worked so hard to support. Another point of resentment became Beth's refusal to return to the work force, and what Brett perceived as an undue focus upon material things. Brett especially worried that this constant focus upon the accumulation and display of wealth was affecting the way that his children viewed the world.

SCARING & CARMAN PLLC

## II. OFFENSE CONDUCT

In retrospect, Mr. Ofsink wishes that he put more effort into communicating with his wife regarding these issues, and reflects that, as a couple, they might have benefited from therapy.

Instead, faced with these simmering pressures, resentments and disappointments, Brett took refuge in a fantasy world. Late in the evenings, Brett began retreating away from his wife into his home office, where he would view pornography. What began as a curiosity grew over time into something more like a compulsion. Sadly, this behavior in many ways reflected the obvious problems in Brett's own relationship, as he sought out materials specifically related to wives and "wife swapping." Over time, however, as he grew desensitized, Mr. Ofsink was exposed to ever more extreme areas of pornography.

These included online chatrooms wherein links to child pornography websites were posted and discussed. Although Mr. Ofsink never disseminated child pornography, he did receive it by clicking on links disseminated through these chatrooms.

According to our forensic review of the computer, it appears that the vast majority of the child pornography found on Mr. Ofsink's computer came from clicking on links which brought him to the "Mega.io" website, which is a cloud storage website. Clicking on a single "Mega" link could bring Mr. Ofsink to an internet share-site with *thousands* of small, "thumbnail" images and videos of child pornography. Once a user is directed to such a site, he or she can scroll through pages and pages of such images, which can then be manually downloaded or saved to the user's computer.

However, as the PSR notes, in Mr. Ofsink's case, these "images and videos did not appear to be stored or catalogued in any particular manner." PSR ¶ 6. That is because there is no evidence that Mr. Ofsink was manually downloading, saving, or collecting child pornography onto his computer.[2] Nevertheless, merely visiting such a site would cause his computer to automatically "cache" each and every one of the files featured on the share site. This accounts for the large amount of child pornography recovered by the Government.

To be clear, we are not seeking to minimize Mr. Ofsink's conduct. These files appear on Mr. Ofsink's computer because he knowingly and intentionally clicked on links which brought him to websites displaying child pornography. Thereafter, his computer would automatically "cache" all images displayed on such websites. The Second Circuit has also made it clear that a computer's automated saving of "cached images" is sufficient to establish the receipt and possession of child pornography. *See*

---

[2] While there were manually saved pornography files on Mr. Ofsink's computer, these manually saved files contained adult pornography with a particular focus on wife-content.

4

*United States v. Ramos*, 685 F.3d 120, 131 (2d Cir. 2012).

But we also think that it is important for the Court to understand how Mr. Ofsink could have accumulated *so many* images and videos for Guidelines purposes. In short, it was possible because even a single such link could direct his computer to a share-site containing thousands of files of child pornography, and because Mr. Ofsink's computer was automatically saving cached versions of each and every such file, regardless of whether the Defendant was aware of it. Indeed, it seems clear that Mr. Ofsink was *not* intentionally saving or maintaining a personal collection of such images. In fact, the forensic evidence does not show one way or another whether Mr. Ofsink actually took the time to personally inspect each and every image displayed on these megalinks (which again, can go on for pages and pages). Nevertheless, we acknowledge that for Guidelines purposes, he is responsible for such images.

### III. AFTERMATH OF OFFENSE CONDUCT

Mr. Ofsink was arrested on June 7, 2019. Since that time, it is not an exaggeration to say that he has lost virtually everything in his life which he once held dear.

In August of 2019, Brett was fired from his job at Ernst and Young; former friends and work colleagues stopped speaking with him, as he quickly became a social pariah.

Thereafter, in late 2019, Beth filed for divorce and for full custody of the children. Worse yet, she has blocked Jordan and Lindsay from receiving mental health evaluations which would be a necessary prerequisite for them to have contact with their father. As a result, Mr. Ofsink has not had so much as a phone call with his two children – who were once the center of his universe – for multiple years. He has no idea what is going on in their day-to-day lives, how they are faring, and what they have been told about his situation. It is unclear what the future holds for the Ofsink family, with Brett unemployed and facing incarceration. At this juncture Mr. Ofsink has expended his entire life savings, and his unemployment benefits have ended.

Despite this, Mr. Ofsink has done everything within his power to shelter his family from the fallout of his actions. He has signed the marital home over to his wife and has agreed to take on all of the couple's marital debt – exceeding $120,000 – in his own name. He hopes that at some point in the future, he may be able to re-establish some semblance of a relationship with his children. As Mr. Ofsink's matrimonial attorney explains in her letter to the Court:

> From the initial commencement of the divorce action, Mr. Ofsink focused on the intent to reunify with his children. He motioned the court with a request for the children to speak to a therapist so that they could be heard in all respects. Mr. Ofsink, out of concern for them, wanted their voices to be heard. He made requests to be permitted to text the children (on a

5

SCARING & CARMAN PLLC

monitored basis) and was agreeable to any restriction so that he could have even minimal contact with them. He repeated his concerns for their wellbeing, their ability to continue their lives without disruption and his hopes that they would somehow be able to understand what happened to their family.

In an effort to protect the children, Mr. Ofsink agreed to transfer 100% of the marital residence to the wife/children while simultaneously transferring the marital debt to his own name. Mr. Ofsink has spent hours of time ensuring that all 529 accounts, life insurance and all household accounts are seamlessly transferred to Mrs. Ofsink so that the children are at least able to finish high school in the home they have always known. This commitment to ensuring stability for the children continued throughout the proceedings.

*See* letter from Alison Keil, Esq, attached hereto as Exhibit B.

At this juncture, Mr. Ofsink resides with his mother in an adult-only community. He has suffered from intense bouts of anxiety, insomnia, and depression as he struggles to come to terms with his offense conduct and its far-reaching repercussions. His current situation is described best by the accompanying letter of Dr. N.G. Berrill, the forensic psychologist appointed by the Court:

> At this point in time, nearly two and a half years have passed since he has received substantive information about his children. It should be noted that there is no indication that Mr. Ofsink posed a danger to his children, however, be that as it may, he demonstrates tremendous sadness when he considers the fact that he has missed important events related to his children's lives and further, that this entire family has been essentially barred from the children's lives, including his mother (paternal grandmother) and two paternal uncles.
>
> It should be noted that Mr. Ofsink has worked consistently in his treatment to manage symptoms related to clinical depression and anxiety. During the course of treatment, he was prescribed psychotropic medications, namely Xanax, to help address episodes of acute anxiety.
>
> Mr. Ofsink was initially unable to sleep, following his arrest and has essentially been tied up in psychological knots over the past two and a half years, as he has availed himself of a number of therapeutic techniques to help manage and attenuate the negative impact that stress, confusion and concerns about the future have had on his life.
>
> During the course of Mr. Ofsink's treatment, there has been no indication that he either fantasizes or finds underage males/females sexually attractive or compelling.

6

Mr. Ofsink takes responsibility for making the mistakes he made while on the computer, however, his major concerns focus on issues related to how he will survive in prison and perhaps, more importantly, how his children are coping, owing to the fact that they essentially lost their father two and a half years ago. He has no idea what the children have been told about the reason for his arrest or why he has been unable to communicate with them.

Based on many psychotherapy sessions with Mr. Ofsink, there is no concern on this clinician's part that he poses a risk or threat to the community with respect to his sexual interests.

*See* June 28, 2021 letter of N.G. Berrill, PH.D., attached hereto as Exhibit C.

Mr. Ofsink is currently doing his best to manage his anxiety, while holding out hope for some semblance of a better future once this case has resolved itself. In this regard, the one positive aspect in his life has been the continuing support of his mother and brothers. Following his period of incarceration, Mr. Ofsink plans to take a position working with his brother Todd, who operates a chain of environmentally friendly cleaners in Manhattan. As Todd writes in his letter to the Court:

> As my business continues to grow, Brett has provided me with some great strategic advice. He has an incredible business acumen and really understands what I am trying to achieve moving forward. I would like to hire Brett to be a partner in my business to keep the momentum going.
>
> By having Brett work with me, he would be able to provide support for his wife and two children, which would allow them to stay in their home. The current situation with his wife and children is dire and they have no money to pay their mortgage, utilities, insurance or put food on the table. I can personally assure you that any reduction in sentence that you give Brett will allow me to bring him on board and support his family.

*See* letter from Todd Ofsink, attached hereto as Exhibit D.

## IV. OBJECTION TO PRESENTENCE INVESTIGATION REPORT

We believe that the Sentencing Guidelines calculation set forth in the Plea Agreement is accurate. That calculation is as follows:

| | |
|---|---|
| Base Offense Level Pursuant to §2G2.2(a)(2) | 22 |
| Defendant Did Not Intend to Traffic in or Distribute Material Pursuant to §2G2.2(b)(1) | -2 |

7

SCARING & CARMAN PLLC

| | |
|---|---|
| Material Involves Prepubescent Minor Pursuant to §2G2.2(b)(2) | +2 |
| Material Involves Sexual Abuse of a Toddler Pursuant to §2G2.2(b)(4)(B) | +4 |
| Offense Involved Use of Computer Pursuant to §2G2.4(b)(6)(A) | +2 |
| At least 600 Images Pursuant to §2G2.4(b)(7)(D) | +5 |
| Obstruction of Justice Pursuant to §3C1.1 | +2 |
| Acceptance of Responsibility Pursuant to § 3E1.1 | <u>-3</u> |
| Total Offense Level | 32 |

The PSR does not include the two-level reduction pursuant to §2G2.2(b)(1). However, we are unaware of any evidence that Mr. Ofsink intended to traffic in child pornography, and no such information is included within the PSR. Accordingly, we respectfully submit that such reduction is appropriate, and that the PSR should be amended accordingly.

Other than that, Defendant has no objections to the PSR.

## V. REQUEST FOR A NON-GUIDELINES SENTENCE

As this Court is well aware, the United States Sentencing Guidelines are merely advisory. *United States v. Booker*, 543 U.S. 220 (2005). Although they represent the starting point of the Court's analysis, they should not be treated as presumptively reasonable for any given offense. *Gall v. United States*, 552 U.S. 38, 50 (2007).

Instead, sentencing requires the Court to make an individualized assessment of "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Having given due consideration to these factors, the "parsimony provision" of § 3553 directs the Court to impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)". This includes the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Finally, § 3553 further directs the Court to consider:

(3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established…by the [sentencing] guidelines… (5) any pertinent policy statement [of the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

See 18 U.S.C.A. § 3553 (a)(3)-(a)(7).

Importantly, "[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring).

Moreover, it is not an abuse of discretion for a court to vary from the Guidelines sentence based solely on policy considerations or because a specific guideline fails to reflect § 3553(a) considerations, fails to incorporate a defendant's characteristics, or is not based on empirical evidence and/or national experience. *See Gall,* 552 U.S. at 38, 46 & n. 2; *Kimbrough,* 552 U.S. at 96; *Nelson v. United States*, 129 S.Ct. 890 (2009). To the extent the Guidelines advise a sentencing judge to impose a sentence that is "greater than necessary" to comply with the purpose of sentencing as set forth in 18 U.S.C. § 3553(a), those Guidelines run counter to Congress' directive that the sentencing judge impose a sentence no greater than necessary to meet the goals of sentencing, and thus, a variance may be indicated to fulfill the statute's directive. *Ibid.*

In this regard, the Second Circuit Court of Appeals has expressly flagged U.S.S.G. § 2G2.2 as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010). § 2G2.2 is unusual because it is not the product of empirical analysis or the data driven approach which is typically employed by the United States Sentencing Commission. Instead, it is largely the product of politics – over the advice and objections of the Sentencing Commission, these Guidelines have been repeatedly amended over the years by Legislative fiat – becoming ever more punitive in the process. Worse yet, as currently drafted, these Guidelines fail to meaningfully distinguish between run-of-the mill offenders – like Brett Ofsink – and more culpable, dangerous individuals. As the Second Circuit has observed:

9

SCARING & CARMAN PLLC

The § 2G2.2 sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. The base offense level for distribution of child pornography, which in 1991 was 13, has been gradually increased to 22 as the Commission has attempted to square the Guidelines with Congress's various directives. On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)). In sum, these enhancements, which apply to the vast majority of defendants sentenced under § 2G2.2, add up to levels, resulting in a typical total offense level of 35.

An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.

*United States v. Dorvee*, 616 F.3d 174, 184-87 (2d Cir. 2010) (internal citations omitted).

Accordingly, while this Court is required to calculate Mr. Ofsink's offense level, we believe that the raw number which results from that calculation is of very little value

10

SCARING & CARMAN PLLC

in determining what sentence is sufficient, but not greater than necessary, to satisfy the policy considerations of § 3553.

Aside from the instant offense conduct, Mr. Ofsink's personal history and characteristics are overwhelmingly positive. He has no criminal history of any kind. To the contrary, Mr. Ofsink has led a quiet life marked by hard work, diligence, and devotion to his family.

Moreover, it does not appear that a sentence of incarceration is necessary to protect the public. In this regard, it bears emphasizing that Dr. Berrill – who does not work for defense counsel – has spent a tremendous amount of time with Mr. Ofsink, seeing him twice weekly for over two years. Following this intensive period of interaction, Dr. Berrill opines that "[b]ased on many psychotherapy session with Mr. Ofsink, there is no concern of this clinician's part that he poses a risk or threat to the community with respect to his sexual interests," and that "there is no indication that Mr. Ofsink posed a danger to his children." In short, Mr. Ofsink does not need to be locked up to protect society at large, or to deter him from committing future offenses.

All of which leaves the question of "just punishment." There is no doubt that child pornography is a scourge on our society, and its cost – in terms of the impact which it has upon young lives – is real and horrific. Mr. Ofsink did not produce, disseminate, or profit from child pornography. But he did receive and possess it. While such an offense surely merits serious punishment, this Court should also consider the repercussions which have already befallen Mr. Ofsink, and which he will continue to endure for the remainder of his life. In a very real sense, the life which Mr. Ofsink once knew has already been irretrievably lost.

As noted in the Presentence Report, 60 months' incarceration is mandated by the law. Under the circumstances, we submit that the interests of justice do not demand a sentence over and above those 60 months of imprisonment. Accordingly, we are respectfully asking this Court to impose the mandatory minimum sentence of five years' incarceration, as punishment which is sufficient, but not greater than necessary, to satisfy all of the policy consideration enumerated under 18 U.S.C. § 3553(a).

Respectfully submitted,

Stephen P. Scaring

cc: AUSA Megan Farrell

11